**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1874

IN RE:  WILLIS TOWERS WATSON plc PROXY LITIGATION.

-------------------------------------------------------------------------------------------------------

REGENTS OF THE UNIVERSITY OF CALIFORNIA, on behalf of themselves
and all others similarly situated,

Plaintiffs − Appellants,

v.

WILLIS TOWERS WATSON PLC; TOWERS WATSON & CO.; WILLIS GROUP
HOLDING PLC; VALUEACT CAPITAL MANAGEMENT; JOHN J. HALEY;
DOMINIC CASSERLEY; JEFFREY W. UBBEN,

Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  Anthony John Trenga, District Judge.  (1:17-cv-01338-AJT-JFA)

Argued:  May 8, 2019                                 Decided:  August 30, 2019

Before KING, DIAZ, and QUATTLEBAUM, Circuit Judges.

Vacated and remanded by published opinion.  Judge Diaz wrote the majority opinion, in
which Judge King joined.  Judge Quattlebaum wrote a dissenting opinion.

**ARGUED:**    Salvatore J. Graziano, BERNSTEIN, LITOWITZ, BERGER &
GROSSMANN LLP, New York, New York, for Appellant.  John A. Neuwirth, WEIL,

GOTSHAL & MANGES LLP, New York, New York; Richard S. Horvath, Jr., ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP, San Francisco, California, for Appellees.  **ON BRIEF:**  John Rizio-Hamilton, Rebecca E. Boon, Julia K. Tebor, BERNSTEIN, LITOWITZ, BERGER & GROSSMANN LLP, New York, New York; Susan R. Podolsky, LAW OFFICES OF SUSAN R. PODOLSKY, Alexandria, Virginia, for Appellant.  Edward J. Fuhr, Eric H. Feiler, Johnathon E. Schronce HUNTON ANDREWS KURTH LLP, Richmond, Virginia; Joshua S. Amsel, Amanda K. Pooler, WEIL, GOTSHAL & MANGES LLP, New York, New York, for Appellees Willis Towers Watson PLC, Towers Watson & Co., Willis Group Holding PLC, John J. Haley, and Dominic Casserley.

---

DIAZ, Circuit Judge:

This appeal concerns a securities class action by a putative class of former shareholders in Towers, Watson & Co. The plaintiffs allege that several defendants violated the Securities Exchange Act by omitting material facts in proxy documents, rendering statements in those documents false or misleading. The district court dismissed the complaint because it was time barred or, in the alternative, because it failed to allege that the omitted facts were material. The putative class now appeals.

As explained below, we reject the district court's grounds for dismissing the complaint. The defendants also present three alternative bases for affirming, but we decline to affirm on any of them. Therefore, we vacate the district court's judgment and remand for further proceedings.

I.

A.

This case arises from the merger of Towers, Watson & Co. ("Towers") and Willis Group Holdings plc ("Willis") into Willis Towers Watson plc ("WTW"). John Haley and Dominic Casserley, the CEOs of Towers and Willis respectively, began discussions in January 2015 about a merger. Negotiations continued for several months. A major investor in Willis, ValueAct Capital Management, and its CEO Jeffrey Ubben were closely involved in the negotiations. ValueAct—which normally invests in companies for three to five years—had held shares in Willis for five years, and it sought to increase the value of its stake before it sold.

3

By May 2015, the merging companies agreed that Haley would be the CEO of WTW and Ubben would be a director and serve on the Compensation Committee. The merging companies also agreed that Willis shareholders would own 50.1% of WTW and Towers shareholders would own 49.9% and receive a dividend of $4.87 per share. Thus, Towers shareholders would own a minority of WTW even though Towers was a more valuable company than Willis.

The two companies announced the merger in June 2015. Following the announcement, Towers' stock price dropped by 8.8% while shares in Willis rose by 3.3%. Several banks, analysts, and financial publications criticized the deal as unfair to Towers. But despite the criticism, Haley did not attempt to renegotiate the terms.

On September 10, 2015 (before a shareholder vote on the proposed merger), Haley met Ubben at a ValueAct conference. At the meeting, Ubben—who, as a future member of WTW's Compensation Committee, would have influence over executive compensation—discussed a proposed compensation plan with Haley for his service as CEO of the combined company. Under the plan, Haley stood to receive up to $165 million in compensation over three years, depending on WTW's performance. This represented a more than six-fold raise over the $25 million he stood to make as CEO of Towers. Haley didn't disclose the pay plan to the Towers directors or shareholders.

A month later, in October 2015, Towers filed a proxy statement with the SEC in anticipation of a shareholder vote on the merger. The proxy stated that the Towers board had considered all conflicts of interest, even though the board wasn't aware of Haley and Ubben's discussions about compensation.

4

After Towers filed the proxy, analysts and investors continued to criticize the merger. One major investor, Driehaus Capital Management, was particularly outspoken in its criticism, raising questions about Haley's interest in the deal. Haley and the Towers board repeatedly denounced Driehaus (never shying away from profanity) and claimed it had made false accusations against Haley.

Soon after the proxy was filed, two investment advising firms recommended that Towers shareholders vote against the merger. Towers and ValueAct pressed for approval of the merger, but shareholders seemed poised to vote against it. So, Haley approached ValueAct and Willis about renegotiating the merger terms.

According to the plaintiffs, Haley never intended to negotiate the best deal for Towers shareholders. Instead, he sought only the minimum concession necessary to convince Towers shareholders to approve the merger. Haley thought a $10 dividend per share was the minimum Towers shareholders would accept, so he proposed raising the dividend for Towers shareholders from $4.87 per share to $10 per share. ValueAct agreed, and after some negotiation, Willis did too. Haley also agreed that the new company would buy back shares, which would increase share value. ValueAct, which stood to reap substantial benefits from a stock buyback, continued to lobby Towers shareholders to approve the deal.

In November 2015, Towers issued a press release and an update to the proxy statement detailing the revised merger terms. The proxy update said nothing about Haley's compensation deal or Haley's alleged choice not to negotiate the best deal for Towers shareholders. The following month, Towers shareholders approved the merger. WTW's

5

board subsequently initiated share buybacks and crafted a compensation plan for Haley that was substantially similar to what Ubben had proposed before the merger. WTW shareholders approved the compensation plan. Soon after, ValueAct sold its shares in WTW and Ubben resigned from WTW's board.

B.

Following the merger, a group of Towers shareholders sued Towers in state court to vindicate their statutory appraisal rights. The state court suit proceeded to discovery. Between February and August of 2017, numerous documents and depositions became public. In the plaintiffs' telling, those documents revealed (for the first time) the material facts of this class action. Armed with the documents from the state court suit, the plaintiffs filed suit in a Virginia federal district court in November 2017.[1]

The amended class action complaint alleges two counts under the Securities Exchange Act of 1934. Count I alleges that WTW, Towers, Willis, Haley, and Casserley omitted facts from the proxy documents so as to render statements therein materially false or misleading, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9. *See* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9. Count II alleges that Haley, Ubben, ValueAct, and Casserley are liable under Section 20(a) of the Exchange Act as control persons of the organizations that violated Section 14(a). *See* 15 U.S.C. § 78t(a).

---

[1] The appraisal action settled in September 2017. *In re Towers Watson & Co. Stockholders Litig.*, No. 2018-0132-KSJM, 2019 WL 3334521, at *7 (Del. Ch. July 25, 2019). Recently, the Delaware Court of Chancery also addressed a consolidated set of breach of fiduciary duty claims by Towers shareholders, dismissing them for failure to state a claim. *See id.* at *7, *11.

6

The district court dismissed the Section 14(a) claim on two alternative grounds. First, the court held that the class complaint was barred by the Exchange Act's statute of limitations because a reasonable plaintiff would have been on notice of the material facts more than one year before the complaint was filed. Second, it held that the complaint failed to allege that the facts omitted from proxy documents were material. The district court also dismissed the Section 20(a) claim because, without the Section 14(a) claim, the plaintiffs could not prove a required predicate securities violation.

This appeal followed.

## II.

We review the dismissal of a complaint under Rule 12(b)(6) de novo. *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 364 (4th Cir. 2012). We accept all well-pleaded allegations as true and construe the facts in the light most favorable to the plaintiffs. *Id.* at 364–65. As we explain, we vacate the district court's dismissal of the complaint and remand for further proceedings.

We begin with the district court's ruling that the Section 14(a) claim is barred by the statute of limitations.[2] The Exchange Act only allows Section 14(a) claims "brought

---

[2] The plaintiffs contend that the district court should not have reached the statute of limitations defense on a motion to dismiss. In general, district courts should not resolve affirmative defenses on a motion to dismiss unless all facts necessary to the defense "clearly appear[] *on the face of the complaint.*" *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)). But we think it proper here to address the merits

7

within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(f). There is no dispute that the November 2017 class action complaint was filed within three years of the violation, which took place in 2015. With respect to the separate one-year "discovery" limitations period, the district court appeared to hold that it began running when the plaintiffs had inquiry notice. Under that standard, the statute of limitations begins running when the plaintiffs have "such knowledge as would put a reasonably prudent purchaser on notice to inquire, so long as that inquiry would reveal the facts on which the claim is ultimately based." *Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1303 (4th Cir. 1993).

The parties agree, however, that inquiry notice is the wrong standard. The right standard, in their view, is the Supreme Court's discovery notice standard from *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010). In *Merck*, the Supreme Court construed a different securities law statute of limitations as running from the time "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first." *Id.* at 637 (quoting 28 U.S.C. § 1658(b)(1)).

We agree that the *Merck* standard applies to claims governed by Section 78i(f). For starters, the relevant language of this statute is identical to the statute at issue in *Merck*. *Compare* 28 U.S.C. § 1658(b)(1) (an action must be brought no later than "2 years after

---

of this issue on appeal because, when viewed under the correct standard, the plaintiffs have not pleaded facts demonstrating that their claims are time barred.

8

the *discovery of the facts* constituting the violation" (emphasis added)), *with* 15 U.S.C. § 78i(f) (an action must be brought "within one year after the *discovery of the facts* constituting the violation" (emphasis added)). And both statutes concern similar private securities actions. Therefore, we hold that the statute of limitations begins to run for a claim governed by Section 78i(f) when the plaintiff has discovery notice.

Applying that standard, we hold that, based on the pleadings, the putative class filed suit within one year of discovering the facts constituting the violation. As outlined in the complaint, the two key facts underlying this Exchange Act suit are that (1) Haley and Ubben had undisclosed discussions about Haley's compensation, and (2) this undisclosed conflict of interest prompted Haley not to maximize shareholder value when renegotiating the merger terms.

It is undisputed that the plaintiffs didn't know those two facts until discovery in the state court lawsuit in 2017.[3] And the plaintiffs have adequately alleged that a reasonably diligent plaintiff wouldn't have discovered those facts before then. As alleged, no shareholders knew about Haley's compensation discussions with Ubben or his strategy in renegotiating the merger. And questioning the board of directors would have been futile. In fact, the Towers board had rebuffed all inquiries about Haley's post-merger compensation or ValueAct's involvement in negotiations. Without the discovery obtained

---

[3] The defendants do contend that (1) counsel representing the putative class knew these facts more than one year before filing the class action complaint, and (2) counsel's knowledge should be imputed to the class. We address that separate affirmative defense in Section IV.C below.

9

in the separate state lawsuit, a reasonably diligent plaintiff would never have known about the key facts.

The defendants don't appear to contest that the plaintiffs didn't know and couldn't have reasonably discovered what the plaintiffs allege to be the key facts until February 2017 or later.[4] Instead, they contend that other facts sufficient to trigger the statute of limitations were public knowledge during the 2015 merger negotiations—such as that Haley would be named CEO of the combined company and thus would logically get a raise. While the district court appears to have accepted that argument, we find it unpersuasive.

Yes, shareholders knew that Haley would be CEO of the combined company and that he stood to make more money after the merger. But those facts alone wouldn't have supported this suit. The basis of this suit is, instead, that Haley's secret dealings with ValueAct created a conflict of interest that led Haley to renegotiate the merger on less favorable terms for Towers than he could have. Simply knowing that Haley stood to benefit from the merger in general wouldn't tell you that.

We hold that (at the pleading stage) the district court erred in dismissing the plaintiffs' suit as time barred. We express no opinion on whether the defendants can prove, after discovery, that the suit is time barred.

---

[4] The defendants (and our dissenting colleague) characterize the plaintiffs' allegations of a secret compensation agreement as conclusory and therefore not worthy of crediting on a motion to dismiss. As we explain later, we do not agree.

10

As a separate ground for dismissing the Section 14(a) claim, the district court held that the alleged omissions described above were immaterial as a matter of law. Why? Because (said the court) shareholders knew that Haley would be CEO of WTW and that he was therefore operating under a potential conflict of interest. Here again, we disagree with the district court.

Section 14(a) forbids anyone from soliciting any proxy "in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78n(a)(1). SEC Rule 14-9, in turn, forbids proxy documents from omitting "any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). Materiality is an objective standard. *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999). A fact is material if there is "a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).

Materiality requires an "inherently fact-specific finding." *Basic*, 485 U.S. at 236. And although materiality is a mixed question of law and fact, assessments of materiality are in most cases "peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Resolving a question of materiality against the plaintiff at the motion to dismiss stage is inappropriate unless "no reasonable jury could find it substantially likely that a reasonable investor would find the fact at issue material in the

'total mix' of information." *Greenhouse*, 392 F.3d at 657; *see also Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018).

The plaintiffs allege that Haley, Towers' chief negotiator, had a significant conflict of interest that arose from his secret compensation arrangement with Ubben. That conflict of interest, in the plaintiffs' view, motivated Haley to close the deal even if the terms were unfavorable to Towers shareholders. There is a substantial likelihood that a reasonable shareholder would have found this undisclosed conflict to be a material change to the total mix of information available, especially if the conflict caused Haley not to seek the best possible merger terms for Towers shareholders.[5] In fact, plaintiffs allege that before the shareholder vote on the merger, a major shareholder asked the Towers board about any coordination or negotiation between Haley and ValueAct. And a Towers board member later stated in a deposition that he would have wanted to know about compensation negotiations between Haley and ValueAct.

The defendants insist that disclosing the alleged compensation agreement wouldn't have changed the total mix of information available to shareholders. In the defendants' telling, the proxy statement and other publicly available information made it clear that

---

[5] *See Swack v. Cred. Suisse First Bos.*, 383 F. Supp. 2d 223, 237–38 (D. Mass. 2004) (failure to disclose that analyst, whom company relied on in a proxy statement, was receiving compensation from the company was material); *see also In re Lear Corp. Shareholder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007) (("[A] reasonable stockholder would want to know an important economic motivation of the negotiator . . . when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price . . . .").

12

Haley would be CEO of the combined company and that his compensation would increase after the merger.

It's true that shareholders knew Haley would make more money after the merger. But they didn't know that—before the merger had closed—Haley had entered secret discussions with Ubben, who was slated for a seat on WTW's Compensation Committee, for a more than six-fold increase in his current compensation. As alleged in the complaint, Haley had a powerful interest in closing the merger to get the compensation he'd discussed with Ubben, even if the terms were unfavorable for Towers shareholders. A jury could thus reasonably conclude that disclosing the secret compensation discussions between Haley and Ubben would have changed the total mix of information available to shareholders.[6]

Our dissenting colleague rejects our conclusion for two related reasons. According to the dissent, the complaint fails to allege that Ubben had authority to bind WTW to a compensation agreement, nor does it allege that Ubben and Haley reached a formal agreement on compensation.

The plaintiffs' complaint, however, repeatedly alleges that Haley and Ubben (who plaintiffs say was slated to serve on WTW's compensation committee) secretly negotiated Haley's future compensation package. And these are not bare allegations. Rather, the plaintiffs allege that Haley and Ubben had a meeting on September 10, 2015 that was

---

[6] The remainder of the defendants' arguments are factual disputes that are not proper grist for a motion to dismiss.

13

undisclosed to the Towers board or shareholders, that Ubben presented Haley at that meeting with a written compensation plan, and that Haley's final compensation after the merger was substantially similar to that plan.

The defendants draw our attention to documents (in the form of public filings related to the merger) that, in their view, disprove the idea that Haley and Ubben reached an agreement. Assuming without deciding that we may consider these documents in resolving a motion to dismiss, they don't conclusively defeat the plaintiffs' allegation of an agreement.

The defendants cite a short email written after the alleged meeting in which Ubben told Haley, "I hope it was informative regarding how we work with our companies. We are excited about working with you and the new board." J.A. 469. That brief statement doesn't preclude the idea that Ubben and Haley reached an agreement. Indeed, if there was such an agreement, Ubben had good reason not to mention it in an email. The defendants also point to a PowerPoint presentation Ubben allegedly showed Haley at their meeting. But while the presentation doesn't prove there was an agreement, it doesn't disprove it either.[7]

---

[7] Our dissenting colleague correctly notes that a separate email (drafted by another ValueAct executive) describes the compensation plan as a proposal. We fail to see, however, how that email standing alone requires us to reject the plaintiffs' factual allegations to the contrary in the complaint. *See Republican Party of NC v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (a motion to dismiss "does not resolve contests surrounding the facts").

14

And even if our dissenting colleague is correct that Ubben could not bind WTW to a compensation agreement, we don't consider that fatal to the plaintiffs' claim.[8] A reasonable jury could nonetheless find that Ubben's influence over Haley's compensation was enough to convince Haley to agree to unfavorable terms for shareholders in order to secure a lucrative compensation package for himself. Reasonable shareholders could consider that influence a material addition to the total mix of available information. [9]

In sum, the plaintiffs have sufficiently alleged that the omitted facts were material. The district court erred in concluding otherwise.

IV.

In their brief, the defendants present three alternative grounds for affirming the district court's dismissal order. *See Pitt County v. Hotels.com, L.P.*, 553 F.3d 308, 311

---

[8] It's also true, as the dissent notes, that the final compensation terms differed from what Ubben and Haley allegedly discussed, and that Haley could only earn the full $165 million if WTW generated a substantial internal rate of return. But neither fact merits a conclusion that the key facts were immaterial as a matter of law. The fact that compensation discussions continued after the merger doesn't defeat the contention that there was an agreement on the broad contours of Haley's pay package. And the high threshold for maximum compensation doesn't change the fact that, under the pay plan discussed in September 2015, Haley stood to earn over six times what he could earn at Towers.

[9] The dissent also points to a recent Delaware Court of Chancery opinion dismissing breach of fiduciary duty suits by Towers shareholders. *See In re Towers Watson & Co.*, 2019 WL 3334521, at *1. While we acknowledge that the Delaware court addressed the same facts and applied a standard for materiality similar to that found in the Exchange Act, we part ways with that court in our assessment of the facts. For the reasons given, we conclude that a reasonable jury could find that the undisclosed compensation negotiations between Haley and Ubben were material.

15

(4th Cir. 2009) (court of appeals may affirm on any ground apparent in the record).  As we explain, however, none support dismissal of the complaint.

A.

The defendants first contend that the complaint fails to plead that the alleged omissions rendered any affirmative statements in the proxy materials false or misleading. They point to the language of SEC Rule 14-9, which states that proxy statements may not omit "any material fact necessary in order to make the *statements therein* not false or misleading."  17 C.F.R. § 240.14a-9(a) (emphasis added).  In the defendants' reading, that regulation means that the complaint must allege that the omission rendered affirmative statements in the proxy false or misleading.

Plaintiffs' first response (which we reject) is that the omission of a material fact is actionable even if it doesn't make an affirmative statement false or misleading.  The text of Rule 14-9 creates liability for "omit[ting] to state any material fact" in a proxy statement only if that fact is "necessary in order to make the statements therein not false or misleading."    17  C.F.R.  § 240.14a-9(a).    We have recognized this principle in our precedents. *See, e.g.*, *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004) ("To form the basis of a cause of action, the statement must be false, or the omission must *render public statements misleading*." (emphasis added)).

16

Plaintiffs also say that the complaint adequately pleads that the omitted facts were necessary to prevent affirmative statements from being false or misleading.[10] We agree. In our view, a jury could find that the proxy statement was misleading when it said that the Towers board was aware of and had considered all conflicts of interest because (as the plaintiffs allege) the board wasn't aware of the compensation negotiations between Haley and Ubben.[11]

In sum, the plaintiffs adequately allege that Haley had a conflict of interest that gave him an incentive to close the merger deal even if it was bad for Towers shareholders. And while the proxy statement did include a general disclosure that Towers officers might have different interests than Towers shareholders, that doesn't immunize Towers from liability for making a misleading statement that it had considered all conflicts. The plaintiffs have therefore met the pleading standard.

---

[10] There is also some support for the plaintiffs' argument that the omission of a material conflict of interest is actionable even if it doesn't make a specific statement false. *See Mendell v. Greenberg*, 927 F.2d 667, 674–75 (2d Cir. 1990); *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986); *Gould v. Am.-Hawaiian S.S. Co.*, 535 F.2d 761, 773–74 (3d Cir. 1976); *cf. Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384 n.6 (1970). But we need not resolve that question to decide this case.

[11] The defendants contend that this statement was one of opinion, which would make it actionable under only limited circumstances. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015). We, however, view the statement as one of fact because it concerns the questions of what the Towers board knew about conflicts and what actions they took in response.

B.

Next, the defendants contend that the plaintiffs fail to allege the requisite scienter for their claims because they sound in fraud. The plaintiffs respond that their claims sound in negligence, so pleading scienter is unnecessary. We conclude that ruling on this issue would require resolving several questions that haven't been adequately briefed in this court or below. We therefore direct the district court on remand to consider the issue in the first instance.

The Exchange Act requires that if the plaintiff may recover damages "only on proof that the defendant acted with a particular state of mind, the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). While the default state of mind for Section 14(a) claims is negligence, the amended class action complaint sounds in fraud and thus (according to the defendants) had to contain particularized allegations of a state of mind that was at least reckless. This issue implicates several legal questions this court has not previously addressed.

First, does a Section 14(a) claim that sounds in fraud require a particularized pleading of scienter? Some courts have answered yes. *See, e.g.*, *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005); *Hershey, v. MNC Fin., Inc.*, 774 F. Supp. 367, 375 n.9 (D. Md. 1991). But we have not given an answer.

Second, can a Section 14(a) claim sound in negligence instead of fraud? The Exchange Act and its implementing regulations don't clearly say. *See* 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9(a). The Supreme Court has reserved the question, and

18

we have not addressed it.  *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 n.5 (1991); *Hayes v. Crown Cent. Petroleum Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003). Some courts have concluded that negligence is enough to support liability.[12]  Others have required something more, at least for certain categories of defendants.[13]

Third, if a Section 14(a) claim does sound in negligence, must the complaint nonetheless include particularized allegations of negligence?  A circuit split has developed on that issue, but we have not staked out a position.  *See Knurr*, 276 F. Supp. 3d at 540 n.8 (collecting cases).

Because these are issues of first impression in this circuit, and they have not been fully developed in the briefing, we direct the district court to consider them in the first instance.

C.

The defendants' last argument for affirming concerns the one-year statute of limitations.  The firm serving as class counsel in this case also represented certain former Towers shareholders in a Delaware state court appraisal rights suit that preceded this class action.  The defendants allege that counsel pursued the same theory of liability in that case

---

[12] *See, e.g.*, *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988); *Herskowitz v. Nutri/Sys., Inc.*, 857 F.2d 179, 189–90 (3d Cir. 1988); *Knurr v. Orbital ATK Inc.*, 276 F. Supp. 3d 527, 539–40 (E.D. Va. 2017).

[13] *See SEC v. Shanahan*, 646 F.3d 536, 546–47 (8th Cir. 2011) (scienter is necessary for outside directors and accountants); *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428–30 (6th Cir. 1980) (same).

19

as they do here (i.e., that Ubben was involved in negotiating Haley's compensation before the shareholder vote on the merger). So, in the defendants' view, the plaintiffs' counsel must have known the material facts behind this class action in the spring of 2016, when they filed the Delaware suit. As a result, the defendants contend that we should impute counsel's alleged knowledge to the entire class under principles of agency law and dismiss the class action, filed in November 2017, as beyond the one-year statute of limitations.

We find the defendants' argument unpersuasive. We are reviewing a motion to dismiss, so we must accept the plaintiffs' well-pleaded factual allegations as true. There is no allegation in the amended class action complaint that class counsel knew the material facts more than a year before November 2017. In fact, the complaint suggests that counsel and class members didn't know the material facts until discovery in the state court suit in 2017.

And to the extent it is appropriate to consult documents outside the complaint, the state court filings in the record don't support the defendants' claim. The defendants point to an affidavit filed in conjunction with a motion to compel the production of documents concerning Ubben's involvement in merger negotiations. But at most, the affidavit demonstrates that the plaintiffs' counsel suspected that Ubben may have played a role in certain aspects of the merger, not that they knew about compensation discussions between Ubben and Haley.

Finally, even if we adopted the defendants' view of the facts, it's not clear that the right course would be imputing that knowledge to the plaintiff class. Under principles of agency law, courts do sometimes impute to a client knowledge that a lawyer obtained

20

before representing that client. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962). But that principle has developed in the context of individual clients, and we have reason to doubt that it should be applied in the same way for class actions. Indeed, district courts have generally declined to impute knowledge from class counsel to class members unless that counsel had previously represented those class members in related individual suits. *See L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n*, 558 F. Supp. 2d 378, 396–99 (E.D.N.Y. 2008); *Schwab v. Philip Morris USA, Inc.*, No. CV 04-1945(JBW), 2005 WL 2467766, at *3–4 (E.D.N.Y. Oct. 6, 2005); *Stieberger v. Sullivan*, 738 F. Supp. 716, 726–27 (S.D.N.Y. 1990).

Accordingly, we reject this alternative basis for affirming the district court's decision.

V.

The second count of the plaintiffs' class action complaint arises under Section 20(a) of the Exchange Act. *See* 15 U.S.C. § 78t(a). A Section 20(a) claim requires an underlying violation of the Exchange Act. *See, e.g.*, *Ridler v. Hutchinson Tech. Inc.*, 216 F. Supp. 3d 982, 991 (D. Minn. 2016). When the district court dismissed the Section 14(a) claim, the only substantive Exchange Act claim, it also dismissed the Section 20(a) claim for lack of a predicate. Because the district court erred in dismissing the Section 14(a) claim, we vacate the dismissal of the Section 20(a) claim as well. We express no opinion on any defenses to liability that the defendants didn't press on appeal.

## VI.

For the reasons given, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

QUATTLEBAUM, Circuit Judge, dissenting:

Throughout the Complaint, Regents of the University of California ("Plaintiffs") criticize the terms of the merger between Willis Group Holdings plc ("Willis") and Towers Watson & Co. ("Towers") as unfair and inadequate for the Towers shareholders. They may be right. But the terms of the merger were adequately disclosed in the proxy statement that solicited votes for the merger (the "Proxy"). And despite public criticism of those terms by vocal Towers shareholders, independent analysts and financial media outlets, the merger passed with over sixty percent of Towers shareholders voting for the merger.

Unhappy with the merger vote, certain Towers shareholders have adopted a scorched earth litigation attack on the merger. In this, at least the third suit by Towers shareholders, Plaintiffs attempt to shoehorn their dissatisfaction with terms of the merger into a claim under § 14(a) of the Securities Exchange Act and Securities and Exchange Commission ("SEC") Rule 14a-9. Plaintiffs allege the Proxy was false and misleading because it failed to disclose a conflict of interest on the part of Towers CEO John Haley, who was Towers' lead negotiator for the merger. Plaintiffs allege that while negotiating the merger terms for Towers as its current CEO, Haley secretly negotiated lucrative terms for his own future compensation as CEO of the merged entity Willis Towers Watson, plc ("WTW"). Plaintiffs further allege Haley advocated for a merger that was a bad deal for Towers shareholders because he wanted his fat, new compensation package. And Plaintiffs claim when the merger was in jeopardy, Haley rescued it by negotiating an increased dividend for Towers shareholders. Yet even in doing that, Plaintiffs claim Haley obtained

23

only the minimum amount to get the deal done, not the maximum amount Willis would pay.

But the Complaint fails to plausibly state a claim. First, despite conclusory statements, the facts alleged in the Complaint fail to plausibly allege that Haley in fact negotiated a secret agreement for his compensation. And even assuming Haley reached a secret agreement, the meeting and the terms of the agreement were not material as required by SEC Rule 14a-9. Based on the facts alleged in the Complaint, Plaintiffs already knew Haley was negotiating the merger terms with Willis even though he had been named the future CEO of WTW. Plaintiffs also knew that as CEO of the much larger merged entity, Haley's compensation would increase. With that information, the fact Haley discussed his potential future compensation with a Willis shareholder, and the details of the potential compensation discussed, would not alter the total mix of information available to shareholders.

Tellingly, the Delaware Court of Chancery, no novice in the area of shareholder litigation, recently rejected a virtual carbon copy of the claims Plaintiffs make here. For the reasons set forth below, I would affirm the district court, and I dissent from my colleagues in the majority.[1]

---

[1] I also believe the district court properly dismissed this case based on the expiration of the statute of limitations. Although I agree with the majority that the discovery rule set forth in *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010) governs the analysis, I believe that Plaintiffs discovered enough information to trigger the statute by November 2016. The facts known to Plaintiffs by that date are more fully set forth in the district court's opinion, and I agree with the district court's ultimate conclusion that the case should be dismissed due to expiration of the statute of limitations.

## I.

Section 14(a) of the Securities Exchange Act forbids any person from soliciting a proxy in contravention of the rules and regulations prescribed by the SEC. 15 U.S.C. § 78n(a)(1). SEC Rule 14a-9, promulgated under § 14(a), prohibits any proxy statement "which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." 17 C.F.R. § 240.14a-9(a). I would affirm the district court and dismiss Plaintiffs' claim under § 14(a) for two reasons. First, I would dismiss the claim because the Complaint does not plausibly allege that the proxy omitted a fact, namely that Haley secretly negotiated a compensation agreement. Second, even assuming there was a secret agreement, I would dismiss the claim because the fact that Haley entered into a compensation agreement was not material given the total mix of information available to investors.

## A.

The majority accurately describes the standard for a complaint to survive a motion to dismiss. "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In considering a motion to dismiss, we are of course required to accept the factual allegations in the complaint as true and to draw inferences from the factual allegations in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). But that requirement has limits. Critical to this appeal, we are not required to accept legal conclusions, unwarranted inferences, unreasonable conclusions or arguments. *Id.*

The crux of Plaintiffs' § 14(a) claim is that the Proxy failed to inform shareholders that Haley met with Jeffrey Ubben in September 2015 and "agreed upon Haley's compensation package as CEO of the combined entity, valued at up to $165 million over the next three years." J.A. 76−77. Ubben was the CEO of ValueAct Capital Management, an institutional investor and Willis shareholder. Thus, Plaintiffs allege the material fact omitted from the Proxy was that Haley and Ubben reached a secret compensation agreement.

But despite the fact that the Complaint depends on an actual compensation agreement, Plaintiffs fail to plausibly plead one. To be sure, Plaintiffs sprinkle references to an agreement and to a negotiated compensation package in their pleading. Like a name dropper at a cocktail party, they use words that on the surface might sound impressive or even sufficient. Yet, when examined carefully, Plaintiffs' allegation of a secret compensation agreement is actually a conclusory statement that fails to support a plausible claim for relief for several reasons.

First, the Complaint fails to allege that Ubben had any authority to enter into an executive compensation agreement on behalf of WTW, an entity that had not been formed at the time Ubben met with Haley. In fact, the shareholders had not even voted on the merger by that time. This point is fundamental because, to merit recognition and disclosure in the Proxy, the alleged agreement between Haley and Ubben would have to be enforceable. Absent some factual allegation that Ubben had the authority to bind WTW, I am not able to draw the reasonable inference that defendants are liable for a violation of § 14(a) for failing to disclose such an agreement. *See Iqbal*, 556 U.S. at 678 ("A claim has

26

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Indeed, the disclosure of an alleged agreement that was unenforceable would have been misleading in itself. Because Plaintiffs failed to make any allegation that Ubben had the authority to bind WTW, I would hold that Plaintiffs' § 14(a) claim lacks facial plausibility. Therefore, dismissal is appropriate.

Second, the factual allegations in the Complaint undercut the conclusory statement that Ubben and Haley entered into a secret agreement. The facts alleged by Plaintiffs, which I accept as true, allege that Ubben met with Haley at a ValueAct conference in San Francisco in September 2015. There, Ubben shared a compensation plan with Haley under which Haley could earn up to $165 million dollars as CEO of the merged entity "if the merger were approved and the benchmarks were achieved." J.A. 39. After the meeting, Ubben emailed Haley, thanked him for the meeting, and wrote "I hope [the meeting] was informative regarding how we work with our companies." J.A. 40. The Complaint also alleges that Alex Baum, the Vice President of ValueAct, sent a follow up email to the Willis Compensation Committee in December 2015 stating that "[Haley] seemed to really like the *general structure and philosophy* behind the comp *proposal*, although his initial reaction was that he wanted even more leverage (i.e. an even lower payout for sub-par performance and even more upside for real outperformance)." J.A. 40 (emphasis added).

The email from Baum, which Plaintiffs quote in the Complaint, indicates that Haley did not reach any agreement about his compensation in September 2015. Rather, it states that when presented with a proposal about potential compensation, Haley suggested

27

changes to the general compensation structure discussed with Ubben. This means that Ubben and Haley reached no agreement at the September 2015 meeting.

The factual allegations also acknowledge that the actual compensation terms accepted by Haley as CEO of WTW were not the same terms discussed in the September 2015 meeting. Plaintiffs allege the agreement that Haley "secretly made with ValueAct" in September 2015 was "substantially identical" to Haley's actual compensation agreement which "provided Haley with the additional leverage . . . by setting the upside for outperformance higher." J.A. 62. This allegation makes clear no compensation agreement was reached in September 2015. "Substantially identical" means different. If there was an actual agreement, there would be no differences between terms agreed to in September and Haley's actual compensation agreement signed in March 2016, after the merger was finalized. Put another way, pleading the necessary agreement is not like playing horseshoes. Close is not good enough. The only reasonable conclusion to be drawn from these factual allegations is that, while there may have been a discussion about compensation, there was no agreement reached in September 2015. And, because there was no agreement, it was unnecessary to disclose the agreement in the Proxy.

This is not mere quibbling over insignificant facts and inferences. The foundation of Plaintiffs' claim is that Haley was corrupted by a secret deal he cut in September 2015. Plaintiffs refer to the deal or agreement over fifty times in its Complaint. If Haley did not in fact reach an agreement on his compensation before the merger passed, the foundation crumbles and the cause of action falls with it.

28

The Supreme Court's seminal *Twombly* decision is particularly instructive. There, plaintiffs' Sherman Act claim required an agreement to restrain trade. The plaintiffs admittedly pled details about anti-competitive conduct and pled that such conduct was carried out pursuant to an agreement. But in setting out the now familiar federal court pleading standard, the Court held that a conclusory allegation of "agreement" without more failed to satisfy Rule 8(a)(2) because it was not accompanied by allegations of circumstances "pointing toward a meeting of the minds." 550 U.S. at 557. Plaintiffs' deficiencies here are even more pronounced. They not only use the conclusory statements of "agreement" and "negotiated compensation package" without circumstances "pointing toward a meeting of the minds." They actually plead facts that establish that Ubben and Haley's minds never met. [2]

In short, Plaintiffs' conclusory statements that Ubben and Haley negotiated a "secret" compensation agreement cannot be credited because the factual allegations in the Complaint, along with the properly considered record evidence, establish that there was no

---

[2] While *Twombly*'s discussion of pleading requirements occurred in the specific context of pleading an agreement as an element a § 1 claim under the Sherman Act, its admonitions against labels, conclusions and factual speculation applies well beyond the antitrust context. *Id.* at 555-56; *see Baird v. Fed. Home Loan Mortgage Corp.*, 706 F. App'x 123 (4th Cir. 2017) (finding that plaintiffs failed to sufficiently allege the existence of a legally enforceable agreement). Indeed, throughout the opinion, the Court expressed the importance of a meaningful review at the Rule 12(b)(6) stage. In rejecting that the argument that is "just shy of a plausible entitlement to relief" should not be dismissed because it can be weeded out through discovery, the Court explained "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings." *Id.* at 559. Unfortunately, our decision today provides ammunition to the very threat recognized by the Court in *Twombly*.

such agreement between Ubben and Haley. To repeat, while this Court must accept all well-pled facts as true we "owe no allegiance to 'unwarranted inferences, unreasonable conclusions, or arguments' drawn from those facts." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (quoting *Monroe v. City of Charlottesville*, 579 F.3d 380, 385–86 (4th Cir. 2009). Based on the facts alleged in the Complaint, Plaintiffs' conclusion that Ubben and Haley entered a secret compensation agreement is unreasonable and unwarranted. Accordingly, Plaintiffs' § 14(a) claim for omitting a material fact fails to state a plausible claim for relief.

B.

Plaintiffs' § 14(a) claim also fails because, even if we accept as true Plaintiffs' conclusory statement that Haley and Ubben entered into a secret agreement relating to Haley's compensation, the omission of this information is not material under SEC Rule 14a-9.

A fact omitted from a proxy statement is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Materiality is a mixed question of law and fact. *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 657 (4th Cir. 2004) (quoting *TSC Indus.*, 426 U.S. at 450). When courts decide they wish for a jury to hear a claim, as my good colleagues do in this case, they emphasize the fact-specific nature of the materiality inquiry. *Id*. Plaintiffs likewise argue that a materiality determination is not appropriate at the motion to dismiss stage. "No shortage of cases, however, make clear that

30

materiality may be resolved by a court as a matter of law." *Id.* (collecting cases). "The only requirement is that no reasonable jury could find it substantially likely that a reasonable investor would find the fact at issue material in the 'total mix' of information." *Id.* (citing *TSC Indus.*, 426 U.S. at 450).

Here, Plaintiffs argue the omission of the "secret" agreement was material because the compensation agreement corrupted Haley going forward and gave rise to a concrete conflict of interest. As an initial matter, any "secret" agreement between Haley and Ubben could not be material as a matter of law because, as explained above, the agreement, as pled, was not enforceable. The Complaint fails to allege that Ubben had any authority to enter into a compensation agreement on behalf of WTW, an entity that had not been formed at the time Ubben met with Haley. Any agreement between Haley and Ubben would then simply be an agreement between two individuals with no binding effect on WTW.

Furthermore, based on Plaintiffs' allegations, the disclosure of this alleged agreement would not have substantially altered the total mix of information due to the disclosures in the Proxy regarding Haley's conflicts and other publicly available information properly considered by the district court.[3]

---

[3] "[I]n determining the total mix of publicly-available information, a court ruling on a 12(b)(6) motion may look to 'documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely.'" *Greenhouse*, 392 F.3d at 656–57 (quoting *Morris v. Wachovia Sec., Inc.,* 277 F. Supp. 2d 622, 629 (E.D. Va. 2003)).

31

First, the Proxy repeatedly disclosed that Haley would serve as CEO of the merged entity after approval of the merger. J.A. 186, 194, 225, 247. The Proxy also specifically disclosed, under the section entitled "Risks Related to the Transaction," that executive officers "may have interests in the Merger that are different from, or in addition to, those of Willis shareholders and Towers Watson shareholders. These interests include, but are not limited to, the continued employment of certain executive officers . . . by the combined company . . . ." J.A. 148−49. This same disclosure also informed shareholders that "the treatment in the Merger of stock options, restricted stock units, bonus awards, severance arrangements and other rights" held by Towers directors and officers could be a further source of conflict and warned Towers shareholders that they "should be aware of these interests" when considering how to vote. J.A. 149.

In addition, Towers shareholders had ample other information regarding Haley's conflict of interest, including press coverage and commentary specifically discussing that Haley had an incentive to approve the merger because he would make more money as the CEO of a large, combined company. "It is important to note that a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." *Greenhouse*, 392 F.3d at 656. And the Towers shareholders were neither ostriches nor children. Indeed, certain Towers shareholders filed suit to enjoin the merger in 2015 and specifically alleged that Haley was a "conflicted director" by virtue of him being named CEO of the combined company and noted that "[a]s the CEO of a combined company that would be approximately twice as large as Towers Watson, Haley would likely receive a major increase in compensation."

32

J.A. 743. This language shows that the Towers shareholders knew in 2015, prior to voting on the merger, that Haley would likely receive a substantial increase in compensation as the CEO of the combined company.

Plaintiffs also allege in the Complaint that the Towers shareholder who was most vocal and active in campaigning against the merger knew by November 2015 that Haley had been in discussions with ValueAct about his potential compensation as the future CEO of WTW if the merger passed. Importantly, this was before the merger vote. Because Haley and ValueAct's discussion about Haley's future compensation was no longer secret prior to the merger vote, the failure to disclose that information cannot be false or misleading.

Plaintiffs attempt to avoid the effect of all this information by contending that, while they knew Haley would be CEO, that was only a potential conflict of interest. In contrast, they contend the information about the September 2015 meeting, establishes an actual conflict. This is simply incorrect. At the time of the merger negotiations, having been named as the CEO of an international risk management and insurance firm with a market capitalization of almost $20 billion, Haley had a vested interest in the merger going through. He had a conflict of interest by virtue of his being named CEO of the combined company with or without an agreement on the specific compensation terms. And that conflict was disclosed numerous times in the Proxy. Certainly, the actual terms of compensation provided additional information about the conflict of interest. But those terms were not necessary to create the conflict.

On this point, it is critical to keep the legal standard for materiality in mind. It is not enough to say that the Towers shareholders would be interested in the information about

33

the meeting and the compensation terms. There are many things that such shareholders might find interesting or that might be nice to know. If that were the standard, virtually no proxy could survive the scrutiny of a disgruntled shareholder. The question for materiality is whether the information is needed to make an informed decision. In other words, would it have significantly altered the total mix of information available? Given what the Towers shareholders already knew about Haley's conflict, the additional information about the meeting and exact compensation terms would not significantly alter the total mix of information available.

Furthering this point is that fact that Haley could earn up to $165 million in compensation only if WTW achieved a thirty percent internal rate of return. Notably, a thirty percent return on investment is remarkable by any measure. If he achieved only average growth, or less, Haley would make less than his peers. A compensation agreement that pays Haley less than his peers unless WTW achieved extraordinary growth—which of course would benefit the shareholders—would not be material.[4]

Finally, I find it important to note that, while not binding on us, the Delaware Court of Chancery recently dismissed a separate class action brought by Towers shareholders

---

[4] While not necessarily relevant on the adequacy of the Proxy disclosures, it is worth noting that when Haley's actual compensation package—the one Plaintiffs allege is substantially similar to the one discussed in September 2015—was put to a shareholder vote after the merger, it was approved.

challenging the merger. In dismissing the complaint, the Delaware court rejected the same theory advanced by Plaintiffs. It held:

> At bottom, the Towers board knew that the CEO would become CEO of the combined company post-merger, that the combined company would be much larger, and that the CEO thus would be entitled to increased compensation. Knowing this potential conflict, the board nevertheless appointed the CEO as lead negotiator but kept apprised of the negotiations. Further, the compensation proposal was a proposal only; it reflected a theory of compensation and upside potential in the event of pie-in-the-sky outcomes unconnected to any business plan or forecast. Given what the board already knew, and the nature of the compensation proposal at issue, a reasonable board member would not have regarded the proposal as significant when evaluating the proposed transaction.

*In re Towers Watson & Co. Stockholders Litig.*, C.A. No. 2018-0132-KSJM, 2019 WL 3334521, at *1 (Del. Ch. July 25, 2019). Like the district court, the Delaware court got it right. Regrettably, we have not.

## II.

Plaintiffs further argue that the district court erred in dismissing their claims under § 20(a) of the Securities Exchange Act. Section 20(a) imposes liability on each person who "controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . ." 15 U.S.C. § 78t(a); *see also Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 n.8 (4th Cir. 2014). Therefore, § 20(a) liability is derivative of a violation of § 14(a). *Yates*, 744 F.3d at 894 n.8. Because Plaintiffs fail to state a claim on their § 14(a) cause of action, I would dismiss the claims under § 20(a) as well.

35

III.

Section 14(a) of the Securities Exchange Act provides important protections against false and misleading statements and omissions in proxy statements. However, it is not designed to ensure the fairness of mergers between sophisticated entities. Rather, its purpose is to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice. In this case, the Proxy was not materially false or misleading, and it provided Towers shareholders with all the information they needed to make an informed choice regarding the merger. Accordingly, I would affirm the district court's order dismissing the Complaint.